Gust G. Larson & Sons, Inc., an Illinois Corporation, Plaintiff-Appellee, v. Radio and Television Broadcast Engineers Local Union No. 1220 of the International Brotherhood of Electrical Workers, Marvin W. Balousek, et al., Officers and Business Representatives of Local 1220, Floyd Linneman, et al., Pickets for the Union, Defendants-Appellants.

Gen. No. 65–97.

Second District.

December 28, 1965.

147

148

Tuite, Shaw, Barden & Morrissey, of Rockford, for appellants.

Miller, Thomas, Hickey & Collins, of Rockford, for appellee.

MR. JUSTICE DAVIS delivered the opinion of the court.

This is an appeal from an interlocutory order granting to plaintiff a temporary injunction which restrained the

defendant union and individual defendants from maintaining pickets at a site at which the plaintiff was constructing a building to house a television station and from interfering in any way with plaintiff's employees or the employees of any of plaintiff's subcontractors.

The plaintiff, a general contractor, was hired by Rock River Television Corp., herein called WCEE–TV, to construct a building to house its broadcasting facilities. At the time in question, the building was not yet completed and WCEE–TV had not commenced televising. All of plaintiff's employees, as well as the employees of its subcontractors, were members of The Rockford Building Trades Union. WCEE–TV, which was not a party to this action, had in its employ two nonunion technical engineers. These engineers were engaged in the installation of technical electronic equipment within the building under construction. The installation of this equipment was not a part of the general construction contract.

The defendants are the Radio and Television Broadcast Engineers Local Union No. 1220, its officers and business representatives, and certain of its members who were picketing at the site. The pickets were all employees of WTVO, a competing television station. It is conceded that the defendants had no dispute with the plaintiff or any of its subcontractors.

The defendants commenced picketing the construction site on August 6, 1965, and continued to do so until August 17. During this period, employees of plaintiff and its subcontractors refused to cross the picket line and no work was done at the site. On the 17th of August the picketing temporarily ceased and there was no picketing until the 23rd of August. During this interval, the construction was resumed. On the 23rd of August the picketing once more began and certain of the employees of the plaintiff and its subcontractors once again refused to cross the picket line, causing a discontinuance of the work. At some time after the picketing began,

WCEE–TV removed its nonunion technical engineers from the site during the day while the construction employees were at work, and caused these engineers to work on the installation of the electronic equipment at the site, during the night.

The signs carried by the pickets read as follows:

"Notice to Public
WCEE–TV Does Not Meet Prevailing
Wages and Working Conditions In Area
We Are Not Asking Other Employees of
Other Employers To Cease Work.
Local 1220—International Brotherhood
of Elect. Workers. AFL–CIO"

WCEE–TV had contracted to commence televising on September 12, 1965. The complaint alleged that if the picketing were to continue, this commitment could not be met. The contract between WCEE–TV and the plaintiff for the construction of the television building provided that if the contractor should fail to supply enough properly skilled workmen, the owner, upon certificate of the architect, could give to the contractor, seven days notice of termination of employment.

On August 11, 1965, WCEE–TV, pursuant to the provisions of the contract, sent notice to the plaintiff that it had failed to proceed diligently with the construction; that the pickets at the construction site did not provide a valid excuse for the failure; that WCEE–TV had to honor its commitments to be on the air September 12; and that it was thus giving the seven days' notice of intention to terminate the contract. The notice was certified by the architect.

On August 25, following the resumption of picketing on August 23, the plaintiff filed this action alleging generally what has been set forth above. The complaint also stated that the pickets approached employees of plaintiff and its subcontractors and truckers in order

151

to prevent them from entering the premises to continue construction work and to deliver materials; that the purpose of the picketing was to compel WCEE–TV to enter into a collective bargaining agreement with the defendant union and constituted a secondary boycott; and that the plaintiff would be caused irreparable harm if the picketing were to continue and if WCEE–TV were to cancel its contract.

The defendants entered their special appearance and filed a motion to quash service of summons, which motion was denied. They then filed their motion to dismiss the complaint which, likewise, was denied. Thereafter, a hearing was held after which the court, on August 30, 1965, granted the temporary injunction. The defendants thereupon prosecuted this appeal, and we have heretofore granted the defendants' motion to stay the temporary injunction order pending a full hearing and final determination by this court.

The defendants' principal contention throughout has been that the acts complained of would constitute an unfair labor practice under section 8(b)(4) of the National Labor Relations Act (29 USCA Sec 158(b)(4)), and that the National Labor Relations Board has jurisdiction over this matter to the exclusion of jurisdiction of our state courts. We agree with this conclusion.

The Labor Management Relations Act leaves much to the states. Congress, however, refrained from indicating how much, and the area in which state action remained permissible has been defined by the slow process of case to case decisions. In Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776, et al., 346 US 485 (1953), at page 488, the court indicated that litigation to date had found state action permissible under one or more of the following circumstances listed in (1)(b), (2) and (3), and in San Diego Bldg. Trades Council v. Garmon, 359 US 236 (1959), at page 246, the court likewise

indicated that state action was permissible under the circumstances set forth in (1)(a) and (2), to wit:

(1) where the Board (a) decides that a matter is not within its jurisdiction; or (b) declines to exercise its powers after its jurisdiction has been invoked;

(2) in instances of injurious conduct which the National Labor Relations Board is without express power to prevent, as where the Board has either made a clear determination, or there is compelling precedent that a particular matter would not, for any reason, be subject to the exclusive jurisdiction of the Board; an example of such circumstance being: where the business affected is so far removed from the Board's minimum jurisdictional requirement that it could not reasonably be assumed that the Board would assert jurisdiction, and a plea of such jurisdiction would, therefore, be considered either frivolous or dilatory;

(3) where violence occurs in a labor controversy due to mass picketing, and public safety and order, or the use of public streets is threatened, or where circumstances give rise to the necessary exercise by the state of its police power.

Before the 1959 amendments to the Labor-Management Relations Act, a series of Supreme Court cases (see San Diego Bldg. Trades Council v. Garmon, 359 US 236 (1959); Guss v. Utah Labor Relations Board, 353 US 1 (1957); Weber v. Anheuser-Busch, Inc., 348 US 468 (1955)) had held that conduct subject to the Act was within the exclusive jurisdiction of the National Labor Relations Board and could not be regulated by the states, even when the Board declined jurisdiction. The 1959 amendment to Section 14 of the Act (29 USCA Sec

164(c)(2)) provides that a state can assert jurisdiction over labor disputes where the Board declines to assert jurisdiction. However, the problem of whether the Board must first rule that it has no jurisdiction in a particular case, before the state courts may step in, has not been fully resolved.

■■ Section 7 of the National Labor Relations Act (29 USCA Sec 157) sets forth certain conduct of employees which is specifically protected, just as Section 8 of the Act defines certain acts which constitute unfair labor practices and are specifically prohibited. In enacting this legislation, "Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies." Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776, et al., supra, 490. Thus, it is apparent that Congress vested in the National Labor Relations Board exclusive primary jurisdiction to pass on the specially protected and prohibited labor practices.

■ If certain activity is either protected by Section 7 of the National Labor Relations Act or prohibited under Section 8 of the Act, it must be regulated or permitted by the National Labor Relations Board under the procedures there applicable. To allow state boards or courts, or federal courts for that matter, to regulate such conduct involves too great a danger of conflict and potential

154

frustration of national purposes in determinations relative to conduct which is part of industrial relations. San Diego Bldg. Trades Council v. Garmon, supra, 243, 244; Guss v. Utah Labor Relations Board, supra, 3; Weber v. Anheuser-Busch, Inc., supra, 475; Norman v. Local No. 4, International Brotherhood of Electrical Workers, AFL–CIO, 40 Ill App2d 422, 426, 427, 189 NE2d 687 (4th Dist 1963); Jersey County Motor Co. v. Local Union No. 525, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 21 Ill App2d 38, 42–45, 156 NE2d 633 (3rd Dist 1959).

■ It is not always apparent whether certain conduct is either within the protected boundaries of Section 7 or prohibited activities described in Section 8 of the Act. It is clear, however, that if this initial determination were left to the courts—state or federal—the conflict in adjudications, which Congress sought to avoid, would be ever present. Thus, if it is either clear, or may fairly be assumed, or if it is arguable that an activity is subject to Section 7 or Section 8 of the Act, it is essential that the initial determination of the applicability of said sections be made by the National Labor Relations Board. Liner v. Jafco, 375 US 301, 306, 307 (1964); Local No. 438 v. Curry, 371 US 542, 546, 547 (1963); San Diego Bldg. Trades Council v. Garmon, supra, 244, 245.

Thus, except in those instances above set forth, or unless the Board has ceded jurisdiction to a state agency, pursuant to Section 10(a) of the Act, a state court may not (with one exception noted later) assume jurisdiction over a labor dispute.

Section 8(b)(4)(i)(B) provides that it shall be an unfair labor practice for a labor organization to "encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in . . . a refusal in the course of his employment . . . to perform any services" where an object thereof is to force or require any other employer to recognize

or bargain with a labor organization as the representative of his employees, unless the labor organization has been certified under the provisions of Section 9 of the Act as the representative of the employees, provided that this clause is not to be construed to prohibit any primary strike or primary picketing, where otherwise lawful.

██ The conduct of the defendants in this case must be conceded to be "arguably" an unfair labor practice proscribed by Section 8 of the Act, if the necessary effect on commerce is present. Indeed, the plaintiff alleges in its complaint that the conduct of the defendants constitutes a secondary boycott. Common-premises picketing often occurs, as here, at construction sites. Generally, it is unlawful secondary conduct if not carried on in conformity with criteria laid down in the Moore Dry Dock Co., 27 LRRM 1108 (1950).

Among other things, the Moore Dry Dock criteria prescribes that the picketing be strictly limited to times when the primary employees are present at the premises; and that it must be conducted in a manner which will minimize its impact on the neutral employers' employees, insofar as this can be done without substantially impairing its effectiveness in reaching the primary employers' employees. Tested by these criteria (the picketing in question having been carried on while the primary employees were absent from the premises) it is at least arguable that the conduct complained of in this action constituted secondary recognition activity prohibited by Section 8(b)(4)(i)(B). See Building and Construction Trades Council of New Orleans, 155 NLRB No. 42, Case No. 15–CC–201 (1965 CCH NLRB Sec 9787); Local Union No. 299, Sheet Metal Workers International Ass'n v. S. M. Kisner & Sons, 48 LRRM 1226 (1961); Local 20, Sheet Metal Workers International Ass'n v. Bergen Drug Co., Inc., 48 LRRM 1307 (1961).

Whether or not the National Labor Relations Board would find that the conduct here complained of is in

fact an unfair labor practice is not our concern. Since the conduct complained of is "arguably" an unfair labor practice, it was for the Board, not the court below, to initially determine whether it would assume jurisdiction to decide the effect of the challenged conduct.

The plaintiff suggests that this dispute is not subject to the jurisdiction of the National Labor Relations Board as the necessary effect on interstate commerce is not present. It urges that under the prevailing National Labor Relations Board jurisdictional yardsticks, the Board will not assert jurisdiction over a television company unless its gross annual volume of business is at least $100,000, and that the television company has not yet commenced business.

 This contention is without merit for several reasons: The Board has consistently held, that in cases involving alleged secondary boycotts where operations of the primary employer do not meet its jurisdictional standards, it will take into consideration, for jurisdictional purposes, not only the operations of the primary employer, but also the entire operations of the secondary employer at the location affected by the conduct complained of. Electrical Workers Union v. Amoskeag Const. Co., 56 LRRM 1173 (1964); Local No. 107 Teamsters Union v. Paravicini, 54 LRRM 1353 (1963); Electrical Workers, Local No. 4 v. Tri-Cities Broadcasting Co., 51 LRRM 1004 (1962); Jemcon Broadcasting Co. v. Local Union No. 1264, 49 LRRM 1492 (1962).

 A building contractor is both a retail and nonretail business in character. Under the prevailing National Labor Relations Board jurisdictional yardsticks, the Board must assert jurisdiction if the relevant business is retail and the employer affected does an annual business of at least $500,000. If the relevant business is nonretail, the Board must assert jurisdiction if the business has a yearly direct or indirect outflow or inflow

of goods or services in interstate commerce of at least $50,000.

■ Thus, in determining whether its business at the location affected meets the jurisdictional standards, the Board may consider both jurisdictional tests. If the plaintiff and its subcontractors have affected at the site, either a gross yearly volume of business of at least $500,000, or outflow or inflow—direct or indirect—of goods or services to, or from, other states in excess of $50,000, then the jurisdictional yardsticks are met. Robert L. Bearrow v. Carpenter Local Union No. 1323, 153 NLRB 136, Case No. AO–86 (1965 CCH Sec 9571).

■ In the case at bar, there was no direct evidence of the amount of business of plaintiff, or of its purchases—direct or indirect—from without the state. However, we do not deem this of any significant help to plaintiff. The National Labor Relations Act is applicable to labor disputes which affect interstate commerce. The jurisdictional yardsticks to which we have referred are merely guidelines indicating those disputes wherein the Board may consider the effect on commerce so insubstantial that it will not assert the jurisdiction given to it. However, if it is found that interstate commerce is affected by a labor dispute, the Board has power to act, without any consideration of the minimum requirements of the jurisdictional yardsticks.

■ Thus, if it is shown that interstate commerce is affected by a labor dispute, it cannot be contended that the case is not "arguably" within the jurisdiction of the National Labor Relations Board merely because the minimum yardstick requirements are not shown. If the minimum dollar volume applicable to a particular industry, as indicated by the yardstick, is found to be present, the Board *must* then assert its jurisdiction; if the minimum standard is not present, the Board may decline to act.

██ An officer of the plaintiff testified that it was not directly engaged in interstate commerce. However, the secondary boycott provisions are applicable to situations where the secondary person is either engaged in commerce or "in an industry affecting commerce." The Board has stated in Local Union No. 299, Sheet Metal Workers International Ass'n v. S. M. Kisner & Sons, 48 LRRM 1226 (1961), at 1229: "We take administrative notice of the fact that the building and construction industry causes the flow of large quantities of goods across State lines and that it therefore affects commerce. As the secondary persons herein are engaged in the building and construction industry, we find that they are engaged in an 'industry affecting commerce' within the meaning of Section 8(b)(4)." See also Local 20, Sheet Metal Workers International Ass'n v. Bergen Drug Co., Inc., 48 LRRM 1307 (1961).

██ Neither Kisner nor Bergen referred to the jurisdictional yardsticks once they asserted that the building and construction industry was an "industry affecting commerce." Both cases indicated that it was the congressional purpose to give the widest coverage to secondary boycott provisions and that, accordingly, the Board would broadly construe the language "engaged in commerce or in an industry affecting commerce" as used in Section 8(b)(4). We are thus of the opinion that where the challenged conduct may reasonably be asserted to constitute a secondary boycott and it also may reasonably be declared that the secondary employer affected is either "engaged in commerce or in an industry affecting commerce," giving to these terms their broadest interpretation, the dispute is one which is then "arguably" within the jurisdiction of the National Labor Relations Board.

There is thus preempted to the National Labor Relations Board the initial determination of all issues relating to its jurisdiction, including the effect on com-

merce, if the case is "arguably" within the limits of the National Labor Relations Act. Marine Engineers Benev. Ass'n v. Interlake S. S. Co., 370 US 173, 182 (1962); Twin City Barge & Towing Co. v. Licensed Tugmen's & Pilots' Protective Ass'n of America, 48 Ill App2d 1, 7, 8, 197 NE2d 749 (1st Dist 1964). To facilitate the prevailing principle of federal preemption in the area of protection under Section 7 and the prohibitions under Section 8, the National Labor Relations Board, under secs 102.98, et seq., of its Rules and Regulations, has made adequate provision for parties to a proceeding before a court or agency, or for the agency or court itself, to file petition for an advisory opinion on whether the Board would assert or decline jurisdiction on the basis of its current standards. (National Labor Relations Board—Rules and Regulations, Series 8, As Amended, secs 102.98, et seq.)

While we readily concede the overwhelming Congressional dictate that our national labor policy be entrusted to a single, centralized administrative agency and acknowledge the power of the Board to render an advisory opinion relative to the issue of jurisdiction, and to seek injunctive relief in matters before it pending its final determination, we believe that there may be times when the Board, for diverse reasons, may be unable to act in time to prevent substantial and irreparable injury to a party to, or enmeshed in, a labor dispute. Under such circumstances, it would be unconscionable to categorically deny the availability of any forum to a person so situated. This would be especially true in the case of a neutral party threatened substantial and irreparable injury merely because he is caught in the middle of the field of labor combat. We do not believe the Supreme Court, in stating that "to the extent a private right may conflict with the public one, the former is superseded" (Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776, et al., supra, 501), meant

160

that a person so trapped, must in all cases, in effect surrender his property or rights because of the potential interference with national policy. We believe that in such situation, in addition to those heretofore enumerated, a state court may properly exercise jurisdiction.

██ ██ It is essential, however, that a person seeking relief through a state court, in such a situation, show by appropriate allegations in the complaint for injunction that he has, in fact, sought the aid of the Board and that the Board has not, or cannot, act in time to prevent substantial and irreparable injury. It is also imperative that a state court, assuming jurisdiction in such a situation, must necessarily exercise judicial self restraint and must be convinced that its refusal to assume jurisdiction would lead to a situation so intolerable that it justifies denying the prevailing principle of federal preemption. (See State ex rel. Tidewater Shaver Barge Lines v. Dobson, 195 Ore 533, 245 P2d 903.)

Absent one or more of the circumstances heretofore enumerated and absent the situation last referred to, a state court is without jurisdiction to hear any cases "arguably" within the specific protection of Section 7 or the prohibitions of Section 8 of the Act. If any of the circumstances exist which permit state action, such appropriate circumstance must be fully alleged in the complaint for injunctive relief in order for the complaint to state a cause of action.

██ In the case at bar the activity complained of is "arguably" within the prohibitions of Section 8 of the National Labor Relations Act. The plaintiff has neither sought to bring the matter before the National Labor Relations Board, nor has it alleged any circumstance bringing its case within the area of permissive state action. Consequently, the trial court was without jurisdiction to order the issuance of a temporary injunction.

Twin City Barge & Towing Co. v. Licensed Tugmen's & Pilots' Protective Ass'n of America, 48 Ill App2d 1,

197 NE2d 749 (1st Dist 1964) and Austin Congress Corp. v. Mannina, 46 Ill App2d 192, 196 NE2d 33 (1st Dist 1964), cited by plaintiff as authority for the proposition that the state court properly enjoined the picketing, are not persuasive, as neither of the cited cases involved a labor dispute.

For the reasons assigned, the order of the trial court granting the temporary injunction is reversed and the cause is remanded with directions to dissolve the injunction and to dismiss the suit.

Reversed and remanded with directions.

ABRAHAMSON, P. J. and MORAN, J., concur.